LORETTA LYNN HALL, INDIVIDUALLY AND          * IN THE CIRCUIT COURT
AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF BENJAMIN ANDREW HALL,              * FOR WASHINGTON COUNTY
30441 Cannon Drive
Salisbury, MD 21804                          * STATE OF MARYLAND

**AND**                                      *CASE NO.:_____

LILLITH D'EUSTACHIO, A MINOR, BY KRISTA      *
D'EUSTACHIO & ANTHONY D'EUSTACHIO,
GRANDPARENTS, GUARDIANS & NEXT FRIENDS, *
7530 Monarch Mills Way
Columbia, MD 21046                           *

**AND**                                      *

ISABELLE BRADFORD, A MINOR, BY APRIL         *
BRADFORD, PARENT, SOLE GUARDIAN AND
NEXT FRIEND,                                 *
6361 Culver Road
Salisbury, MD 21801                          *

**AND**                                      *

OWEN HALL, A MINOR, BY JAMIE ALBERO,         *
PARENT, SOLE GUARDIAN AND NEXT FRIEND,
1305 Middle Neck Drive                       *
Salisbury, MD 21804
                                             *
         *Plaintiffs,*
                                             *
v.                                           *
                                             *
STATE OF MARYLAND,
80 Calvert Street                            *
Annapolis, MD 21401
    SERVE: NANCY K. KOPP, STATE TREASURER    *
         80 Calvert Street
         Annapolis, MD 21401                 *

**AND**                                      *

SECRETARY STEPHEN T. MOYER,                  *
Department of Public Safety and Correctional Services
300 East Joppa Road, Suite 1000              *
Towson, MD 21286

**AND**                                                          *

**WARDEN DENISE GELSINGER,**                                     *
Maryland Correctional Institution Hagerstown
18601 Roxbury Road                                              *
Hagerstown, MD 21746
                                                                *
**AND**
                                                                *
**ASSISTANT WARDEN KEITH LYONS,**
Maryland Correctional Institution Hagerstown                    *
18601 Roxbury Road
Hagerstown, MD 21746                                            *

**AND**                                                          *

**LIEUTENANT STEVE THOMAS,**                                     *
Maryland Correctional Institution Hagerstown
18601 Roxbury Road                                              *
Hagerstown, MD 21746
                                                                *
**AND**
                                                                *
**LIEUTENANT RYAN SULLIVAN,**
Maryland Correctional Institution Hagerstown                    *
18601 Roxbury Road
Hagerstown, MD 21746                                            *

**AND**                                                          *

**SERGEANT BRADLEY ROSE,**                                       *
Maryland Correctional Institution Hagerstown
18601 Roxbury Road                                              *
Hagerstown, MD 21746
                                                                *
**AND**
                                                                *
**CORRECTIONAL OFFICER CODY NELLING,**
Maryland Correctional Institution Hagerstown                    *
18601 Roxbury Road
Hagerstown, MD 21746                                            *

**AND**                                                          *

**CORRECTIONAL OFFICER DEAN VOSBURGH,**                          *
Maryland Correctional Institution Hagerstown

18601 Roxbury Road                              *
Hagerstown, MD 21746
                                                *
**AND**
                                                *
**CORRECTIONAL OFFICER ERIC FISCHER,**
Maryland Correctional Institution Hagerstown    *
18601 Roxbury Road
Hagerstown, MD 21746                            *

**AND**                                         *

**CORRECTIONAL OFFICER RONALD JACKSON,**  *
Maryland Correctional Institution Hagerstown
18601 Roxbury Road                              *
Hagerstown, MD 21746
                                                *
     *Defendants.*
*     *     *     *     *     *     *     *     *     *     *     *     *
Mr. Clerk:

      Please file the enclosed Complaint, Civil Information Sheet, and Jury Trial Election. Please

enter the appearance of Robin R. Cockey, Ashley A. Bosché, and Cockey, Brennan & Maloney,

P.C., as attorneys for Plaintiffs.  Please issue summons and return them to Plaintiffs' counsel for

service.

<div style="margin-left: 40%;">

/s/
_____
ROBIN R. COCKEY, ESQUIRE
CPF # 8011010072
ASHLEY A. BOSCHÉ, ESQUIRE
CPF # 0712110076
Cockey, Brennan & Maloney, P.C.
313 Lemmon Hill Lane
Salisbury, MD 21801
410-546-1750
Fax: 410-546-1811
rrcesq@cbmlawfirm.com
bosche@cbmlawfirm.com
*Attorneys for Plaintiffs*

</div>

LORETTA LYNN HALL, INDIVIDUALLY AND
AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF BENJAMIN ANDREW HALL,
30441 Cannon Drive
Salisbury, MD 21804

    AND

LILLITH D'EUSTACHIO, A MINOR, BY KRISTA
D'EUSTACHIO & ANTHONY D'EUSTACHIO,
GRANDPARENTS, GUARDIANS & NEXT FRIENDS,
7530 Monarch Mills Way
Columbia, MD 21046

    AND

ISABELLE BRADFORD, A MINOR, BY APRIL
BRADFORD, PARENT, SOLE GUARDIAN AND
NEXT FRIEND,
6361 Culver Road
Salisbury, MD 21801

    AND

OWEN HALL, A MINOR, BY JAMIE ALBERO,
PARENT, SOLE GUARDIAN AND NEXT FRIEND,
1305 Middle Neck Drive
Salisbury, MD 21804

    *Plaintiffs,*

v.

STATE OF MARYLAND,
80 Calvert Street
Annapolis, MD 21401
    SERVE: NANCY K. KOPP, STATE TREASURER
        80 Calvert Street
        Annapolis, MD 21401

    AND

SECRETARY STEPHEN T. MOYER,
Department of Public Safety and Correctional Services
300 East Joppa Road, Suite 1000
Towson, MD 21286

* IN THE CIRCUIT COURT

* FOR WASHINGTON COUNTY

* STATE OF MARYLAND

*CASE NO.:_____

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

19 SEP 17  PM 1:58
INSURANCE DIVISION

1

AND                                                    *

**WARDEN DENISE GELSINGER,**                           *
Maryland Correctional Institution Hagerstown
18601 Roxbury Road                                     *
Hagerstown, MD 21746
                                                       *
AND
                                                       *
**ASSISTANT WARDEN KEITH LYONS,**
Maryland Correctional Institution Hagerstown           *
18601 Roxbury Road
Hagerstown, MD 21746                                   *

AND                                                    *

**LIEUTENANT STEVE THOMAS,**                           *
Maryland Correctional Institution Hagerstown
18601 Roxbury Road                                     *
Hagerstown, MD 21746
                                                       *
AND
                                                       *
**LIEUTENANT RYAN SULLIVAN,**
Maryland Correctional Institution Hagerstown           *
18601 Roxbury Road
Hagerstown, MD 21746                                   *

AND                                                    *

**SERGEANT BRADLEY ROSE,**                             *
Maryland Correctional Institution Hagerstown
18601 Roxbury Road                                     *
Hagerstown, MD 21746
                                                       *
AND
                                                       *
**CORRECTIONAL OFFICER CODY NELLING,**
Maryland Correctional Institution Hagerstown           *
18601 Roxbury Road
Hagerstown, MD 21746                                   *

AND                                                    *

**CORRECTIONAL OFFICER DEAN VOSBURGH,**                *
Maryland Correctional Institution Hagerstown

18601 Roxbury Road                              *
Hagerstown, MD 21746
                                                *
**AND**
                                                *
**CORRECTIONAL OFFICER ERIC FISCHER,**
Maryland Correctional Institution Hagerstown    *
18601 Roxbury Road
Hagerstown, MD 21746                            *

**AND**                                          *

**CORRECTIONAL OFFICER RONALD JACKSON,**  *
Maryland Correctional Institution Hagerstown
18601 Roxbury Road                              *
Hagerstown, MD 21746
                                                *

     *Defendants.*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT

Plaintiffs Loretta Lynn Hall, individually and as personal representative of the Estate of

Benjamin Andrew Hall; Lillith d'Eustachio, a minor, by Krista d'Eustachio and Anthony

d'Eustachio, grandparents, guardians, and next friends; Isabelle Bradford, a minor, by April

Bradford, parent, sole guardian, and next friend; and Owen Hall, a minor, by Jamie Albero, parent,

sole guardian, and next friend file this lawsuit against Defendants asserting claims under 42 U.S.C.

§ 1983, Articles 24 and 26 of the Maryland Declaration of Rights, and, under the common law of

Maryland, for wrongful death and "survival." All claims arise from the death of Benjamin Andrew

Hall ("Decedent"), who was an inmate at the Maryland Correctional Institution – Hagerstown

("MCIH") at the time of his death. While in the care, custody and control of Defendants, Decedent

was brutally beaten to death by his cellmate, Mark Andrew Topper ("Mr. Topper").

3

## JURSIDCTION AND VENUE

1.      This Court has jurisdiction pursuant to § 6-102 and § 6-103 of the Courts and Judicial Proceedings Article ("CJ") of the Maryland Annotated Code.

2.      Venue is proper in this Court pursuant to CJ § 6-201.

3.      Prior to filing this suit, Plaintiffs gave notice of their claims to the State Treasurer within one year of Decedents' death, and the State Treasurer's Office denied their claims. This suit is brought within three years of Decedent's death.

## PARTIES

4.      Decedent was an inmate incarcerated under the exclusive care, custody, and control of the State of Maryland by and through the Division of Corrections, a division of the Department of Public Safety and Correctional Services ("DPSCS"). Plaintiff Loretta Lynn Hall ("Ms. Hall") is the surviving mother of Decedent and the personal representative of his Estate. She is a resident of Wicomico County. Ms. Hall brings this action in her individual capacity and as personal representative of Decedent's estate.

5.      Plaintiff Lillith d'Eustachio is a minor and a surviving daughter of Decedent. She is a resident of Howard County. Suit is brought on her behalf by her grandparents and legal guardians Krista d'Eustachio and Anthony d'Eustachio.

6.      Plaintiff Isabelle Bradford is a minor and a surviving daughter of Decedent. She is a resident of Wicomico County. Suit is brought on her behalf by her mother and sole legal guardian April Bradford.

7.      Plaintiff Owen Hall is a minor and the surviving son of Decedent. He is a resident of Wicomico County. Suit is brought on his behalf by his mother and sole legal guardian Jamie Albero.

4

8.     Defendant State of Maryland ("State") was in charge of and operated the DPSCS and, in turn, MCIH. It was responsible for and had the duty to provide care, safekeeping, and protection to all persons incarcerated within the State's correctional system. It was also the employer of all other named Defendants, who are sued in this action both individually and in their capacity as agents, servants, and employees of the State acting with the scope of their employment and acting under color of federal and state law.

9.     Defendant Secretary Stephen T. Moyer ("Secretary Moyer") is and was the Secretary of DPSCS at the time of Decedent's death. Secretary Moyer was responsible for formulating rules, policies, and procedures for the operation of the correctional system for the State; promulgating, regulating, and overseeing policies concerning staffing and all correctional services in the State; and hiring, training, and supervising adequate and sufficient staff to ensure the care, safekeeping, and protection of inmates within the State's correctional system. Secretary Moyer was charged with overseeing and supervising the care, safekeeping, and protection of inmates entrusted to the State and all State correctional employees who were responsible for effectuating those practices, procedures, and policies in correctional facilities across the State, including MCIH, on a day-to-day basis.

10.     Defendant Warden Denise Gelsinger ("Warden Gelsinger") is and was the Warden of MCIH at the time of Decedent's death. Warden Gelsinger was responsible for the administration, operation, and supervision of MCIH staff and facilities; the custody and control of MCIH inmates; the training and supervision of MCIH staff; and implementing the practices, procedures, and policies promulgated by Secretary Moyer at MCIH. At all relevant times, Warden Gelsinger was responsible for the care and supervision of Decedent. Warden Gelsinger had the

5

responsibility to monitor inmate activity affecting security issues and communicate as necessary with MCIH's Assistant Warden and command staff regarding security matters.

11.    Defendant Assistant Warden Keith Lyons ("Assistant Warden Lyons") is and was the Assistant Warden of MCIH at the time of Decedent's death. Assistant Warden Lyons was responsible for the administration, operation, and supervision of MCIH staff and facilities; the custody and control of MCIH inmates; the training and supervision of MCIH staff; and implementing the practices, procedures, and policies promulgated by Secretary Moyer at MCIH. At all relevant times, Assistant Warden Lyons was responsible for the care and supervision of Decedent.  Assistant Warden Lyons had the responsibility to monitor inmate activity affecting security issues and communicate as necessary with MCIH's command staff regarding security matters.

12.    Defendants Lieutenant Steve Thomas ("Lt. Thomas") and Lieutenant Ryan Sullivan ("Lt. Sullivan") were working the 4-12 shift the night Decedent was murdered.  They were, at all relevant times, responsible for the care and supervision of Decedent the night he died, monitoring, training, and supervising correctional officers at MCIH, and enforcing rules and procedures regarding inmate behavior and treatment.

13.    Sergeant Bradley Rose ("Sgt. Rose") was a sergeant working the 4-12 shift the night Decedent was murdered and, according to records, was "the officer in charge." Sgt. Rose was, at all relevant times, responsible for the care and supervision of Decedent the night he was murdered, monitoring, training, and supervising correctional officers regarding interaction with inmates, and enforcing rules and procedures regarding inmate behavior and treatment.

14.    Correctional Officers Cody Nelling ("COII Nelling"); Dean Vosburgh ("COII Vosburgh"); Eric Fischer ("COII Fischer"); and Ronald Jackson ("COII Jackson") were

6

correctional officers working the 4-12 shift the night Decedent was murdered. Each had direct responsibility for the care, safekeeping, protection, and monitoring of Decedent and all inmates on the administrative segregation unit where Decedent was housed at MCIH.

15.     Defendants were at all relevant times responsible for the custodial care of Decedent. They had a duty to protect all inmates, including Decedent, from violence at the hands of other inmates. They were obligated to take reasonable steps to protect inmates from substantial risk of harm when that risk was to be expected.

## FACTS COMMON TO ALL COUNTS

16.     Decedent grew up in Salisbury, Maryland with his mother, Ms. Hall, and his brother. Decedent quit attending high school and started working full time at a local convenience store. Decedent was quickly promoted to manager and worked a number of years without incident.

17.     In 2009, Decedent had a daughter, Isabelle. He had another daughter, Lillith, and a son, Owen, in 2011. Decedent helped care for and provided financial support for his young children.

18.     In or around 2010, Decedent started to experiment with drugs recreationally. In 2012, Decedent was convicted of his first crime – possession of drug paraphernalia. Following that conviction, Decedent spiraled into drug addiction and began stealing to support his habit.

19.     In 2013, Decedent was convicted of theft and sentenced to seven years of incarceration.

20.     Decedent began his incarceration at Eastern Correctional Institute ("ECI") at the age of 23.

21.     Decedent was murdered while in the care, custody, and control of the State, just three years later, at the age of 26. In those intervening years, Decedent was shuffled around

7

Maryland's prison system, but was still able to earn his GED and a certificate in welding, and to get sober.

22.   Shortly into his incarceration at ECI, Decedent was attacked by another inmate, believed to be African American. Following the attack, the Aryan Brotherhood ("AB") offered security and protection to Decedent. The AB is a neo-Nazi prison gang and organized crime syndicate. Decedent, who is White, joined the AB believing he had no choice in order to survive his sentence.

23.   On December 12, 2015, Decedent was transferred to Jessup.

24.   Although Decedent's base file shows the date of the move to Jessup, it does not provide the reason for the move.

25.   Decedent remained at Jessup until August 11, 2016, when he was transferred to MCIH.

26.   Although Decedent's base file shows the date of the move to MCIH, it does not provide the reason for the move.

27.   On August 14, 2016, John O'Sullivan ("Mr. O'Sullivan") (White) was fatally stabbed inside Jessup.

28.   Mr. O'Sullivan was a member of the gang, Dead Man Incorporated ("DMI"), whose members are referred to as "dawgs."

29.   Like AB, DMI is a predominantly White prison gang; the AB and DMI are rival gangs.

30.   It is believed and, therefore alleged, Mr. O'Sullivan was murdered by members of the AB.

8

31.     According to an Administrative Segregation Investigative Report dated August 15, 2016, Decedent was to be placed on administrative segregation "due to concerns for his safety."

32.     According to Defendants, Decedent was placed on administrative segregation because of the murder of Mr. O'Sullivan. MCIH determined there was to be no contact between members of the AB and DMI.

33.     Decedent was to remain on administrative segregation until an investigation could be completed to determine if Decedent could be safely housed at MCIH.

34.     On August 19, 2016, Decedent was attacked by members of DMI and injured. The attack happened in the presence of MCIH correctional officers while Decedent was handcuffed and could not defend himself.

35.     There is no reference to the August 19 attack in Decedent's base file save Decedent's grievance to Warden Gelsinger dated September 19, 2015.

36.     In his grievance, Decedent reported he was attacked by DMI members on August 19 in D-tier while he was wearing handcuffs.

37.     According to Decedent, correctional officers had placed him in the middle of four cells full of DMI members.

38.     Decedent was to have no contact with DMI members, and was assigned to B-tier (and not D-tier where the attack had occurred).

39.     Decedent complained in his grievance that he was struck in the shoulder by "some kind of steele [sic] inside of a sock" and was denied medical care.

40.     Decedent's grievance was dismissed by Defendants for "procedural reasons."

41.     Decedent was instructed to resubmit his grievance by October 14 with additional information.

42.     Before Decedent could resubmit his grievance, he was murdered.

43.     Mr. Topper, Decedent's cell mate, beat Decedent to death in their cell the night of October 10, 2016.

44.     MCIH's records contain conflicting information as to when Mr. Topper became Decedent's cell mate.

45.     One record indicates Mr. Topper was placed in Decedent's cell on September 22.

46.     But, according to the Maryland State Police's investigative report on the murder of Decedent, MCIH had completed its own investigation and prepared a report dated October 11, 2016, just one day after Decedent was murdered.  That report included a letter from "Intel Sgt. Donia" in which he/she reported Decedent had refused a number of inmates because they were "not one of mine," but agreed for Mr. Topper to move in on August 19, 2016.

47.     Based upon MCIH's records, it appears Decedent was in a cell by himself from August 11, the date he was transferred from Jessup to MCIH, until Mr. Topper was placed in his cell, whatever date that was.

48.     According to Decedent's grievance, he was attacked by DMI members on August 19, the same day Intel Sgt. Donia said Mr. Topper "moved in" with Decedent.  Decedent refers to Mr. Topper as his "cell buddy" in his grievance regarding the August 19 attack.

49.     Once Mr. Topper became cellmates with Decedent, he told his mother by phone and letter he believed Mr. Topper was "prospecting" with the AB.

50.     Decedent and his mother talked and spoke regularly.  Decedent told Ms. Hall that Warden Gelsinger had personally gone to him to tell him that Mr. Topper would be placed in his cell "temporarily."

51.     Decedent was supposed to be in a cell by himself for his safety.

10

52.    Mr. Topper was not a member of or affiliated with any gangs and had been assigned to disciplinary segregation.

53.    Mr. Topper was nine years Decedent's senior and had been sentenced to thirty years in jail for CDS possession with intent to distribute, armed robbery, robbery, and burglary.

54.    Just prior to his death, Decedent learned Mr. Topper had been placed in his cell to kill him. Decedent told his mother and his friend that there was talk around HCIH the AB had ordered a hit on him and that Mr. Topper would earn his "stripes" (or place in the gang) by attacking him.

55.    According to Decedent, he intercepted a "kite," which is a written message passed amongst the inmates, which confirmed the AB had ordered a hit on Decedent.

56.    Decedent told his mother he knew the members of the AB who were responsible for the murder of Mr. O'Sullivan. According to Decedent, the AB believed Decedent was cooperating with authorities on the investigation. As a result, members of his own gang wanted him killed because they believed him to be a "snitch."

57.    Alarmed by her son's fears, Ms. Hall left voicemails for Warden Gelsinger and the Chaplain.

58.    Warden Gelsinger never returned Ms. Hall's calls.

59.    On October 2, 2016, Decedent called his mother. During the course of the telephone call, Decedent told his mother that Mr. Topper was planning to kill him to get initiated into the AB. The call was terminated by MCIH, indicating officials were listening to their conversation and, consequently, overheard Decedent's fears that Mr. Topper would kill him.

60.    On the night of the attack, Decedent and Mr. Topper were drinking alcohol in their cell.

61.     According to Mr. Topper, they each drank four cups of alcohol and got into an argument.

62.     Mr. Topper claimed Decedent started "running his mouth" about "his brothers," referring to the AB.

63.     Decedent allegedly put his hands in Mr. Topper's face, causing Mr. Topper to push him away.

64.     According to Mr. Topper, Decedent then punched him in the face, knocking his tooth out. (Mr. Topper was observed with a missing tooth when police arrived to the crime scene).

65.     By Mr. Topper's own account, he then went "berserk" and used his hands and feet to beat Decedent to death.

66.     During his 10:30 tier walk, COII Nelling observed Decedent laying chest up in a large puddle of blood with a bloody white t-shirt covering his face and Mr. Topper standing over his lifeless body.

67.     When Mr. Topper saw COII Nelling, Mr. Topper told COII Nelling, "Get him out of here because he's gone."

68.     According to MCI's Log Book for B-Tier, COII Nelling did a tier walk every half hour upon starting his shift at 4:00 p.m. COII Nelling reported that, during his tier walk at 10:00 p.m., he found Decedent and Mr. Topper to be "alive and fine."

69.     Upon finding Decedent's lifeless body, COII Nelling radioed for backup and medical personnel were called.

70.     The nurse responded immediately and confirmed Decedent was dead.

71.     Meanwhile, Mr. Topper was cuffed and removed from the cell.  At the time Mr. Topper was found and removed from the cell, he was wearing boots and a fresh shirt.

72.     According to Lt. Sullivan, when he met Mr. Topper after the attack, he found him to be "intoxicated."

73.     Investigators searched the cell and observed Decedent dead on the floor with his head turned toward the cell door.

74.     Decedent had an Adidas shoe print on his chest and forehead, puncture marks to the left side of his chest, ligature marks to his neck, and damage to his face.

75.     Mr. Topper's blood-stained Adidas shoes were laying on his lower bunk.

76.     In a statement given to police, Mr. Topper said he hit Decedent, slammed him against the wall, and held him down, "stomping his head, throat, and chest," until Decedent stopped breathing.  Mr. Topper also admitted to using a sharpened scrabble piece in the attack which he flushed before COII Nelling arrived.

77.     Decedent's body was transferred to the Office of the Chief Medical Examiner, where an autopsy was performed by Dr. Jack Titus, a forensic pathologist.  According to Dr. Titus' postmortem report,

> There were injuries, which consisted of abrasions, contusions and lacerations to the head, face, neck, torso and extremities.  The injuries to the head caused bleeding beneath the scalp.  The injuries to the neck caused bleeding to the neck muscle and petechiae of the right eye and epiglottis.  The injuries to the torso caused rib fractures, lung contusion (bruises), and small bowel mesenteric hemorrhage (bleeding) and contusion (bruising).  The sharp force injuries were superficial, but were associated with bleeding.  Some of the injuries to the head, face, torso, and extremities had a pattern to them which is suggestive of a shoe print.  The manner of death is **homicide**.  The deceased had been consuming alcohol beverages prior to death.  Postmortem toxicology testing for illicit drugs was negative.

(Emphasis supplied).

78.     According to Dr. Titus, the time of injury was 10:00 p.m.

79.     According to an email written by Ronald Brezler, Chief of Security at MCIH, Decedent was discovered in his cell wrapped in sheets and covered in blood at approximately 10:45 p.m.

80.     At least forty-five minutes elapsed from the time Decedent was beaten to death until he was found dead by COII Nelling.

81.     Ms. Hall was notified of her son's murder on Tuesday, October 11. A state trooper arrived at her home and told her that her son had been killed by his cellmate. That same trooper told Ms. Hall she should be "proud" of Decedent, that Decedent had "stood up" and "did the right thing," apparently referring to his cooperating with authorities.

82.     Defendants' acts and omissions reflect a conscious and unreasonable disregard for risk of serious harm and deliberate indifference to Decedent's rights under federal and state law.

83.     Defendants showed a deliberate indifference to Decedent's safety in the weeks leading to his death. Defendants ignored complaints from Decedent and his mother about his safety and failed to follow written directives and procedures, all of which created hazardous and unconstitutional conditions. Beginning with the August 19 attack, Defendants created a dangerous situation by allowing contact between Decedent and DMI members, and, then, were unable or unwilling to protect him during the attack. Defendants failed to make a record of the August 19 attack, provide Decedent medical treatment for injuries sustained in the attack, and dismissed his complaint about the attack for purely technical reasons. Defendants then placed Mr. Topper in the same cell as Decedent without completing their investigation into whether Decedent could be safely housed at MCIH. Before placing Mr. Topper in Decedent's cell, Decedent was in a cell by himself. Defendants knew the AB and DMI were feuding and, nonetheless, put an inmate, who was on disciplinary segregation, in the same cell as Decedent. Defendants ignored warnings from

14

Decedent and his mother that the AB had ordered a hit on Decedent because they believed him to be a "snitch" and that Mr. Topper would earn his "stripes" (or place in the AB) by attacking Decedent.

84.    Defendants showed a deliberate indifference to Decedent's safety on the night of Decedent's death. Defendants' acts and omissions demonstrate that they knowingly and unreasonably disregarded an intolerable risk of serious harm, failed to provide humane conditions of confinement, failed to take reasonable measures to provide for the safety of Decedent, and violated their duty to protect Decedent from violence at the hands of Mr. Topper. Defendants allowed, condoned, or overlooked Decedent and Mr. Topper consuming alcohol to the point Mr. Topper was intoxicated. Even assuming (improbably) Mr. Topper and Decedent were somehow able to conceal the alcohol, their drinking that alcohol, and their intoxication from COII Nelling and the other Defendants working that evening, Defendants should have responded to the scene long before Decedent was found dead. Decedent and Mr. Topper were drunk, they started to argue, and their argument escalated to a fist fight, which resulted in Mr. Topper beating and stomping Decedent to death. The noises inevitably involved in Decedent's struggle to survive should have alerted authorities to act. Had officials responded after hearing the argument or seeing suspicious movement, they could have prevented Decedent's death. Decedent was found lifeless in his cell, even though COII Nelling claimed to have checked on Decedent and Mr. Topper during his 10:00 p.m. rounds and found them "alive and fine." According to the autopsy report, the time of injury was 10:00 pm. It was impossible for COII Nelling to have actually conducted his rounds at 10:00 p.m. and not noted any issues. Decedent was not found by COII Nelling until forty-five minutes after the prolonged, vicious, and noisy attack. The failure of Defendants to provide timely and

proper assistance to Decedent in a helpless condition amounted to deliberate indifference on the part of Defendants.

85.     Decedent was found dead with his head turned toward his cell door; he was looking and waiting for help that never came.  As a direct and proximate result of Defendants' acts and omissions, Decedent suffered extreme distress, pain and suffering, loss of consciousness, and, finally, death as he laid helplessly on his cell floor while Mr. Topper literally kicked the life out of him.

86.     Decedent left behind his mother and three young children, who are forever deprived of his care, companionship, and guidance.  Prior to Decedent's drug addiction, he was a productive member of society, working a full-time job.  In jail, Decedent was able to shake his drug addiction and earn his GED and a welding certificate.  There was every reason to believe Decedent would continue the "turn-around" he had made in prison and become a source of financial and emotional support for his three innocent children.

## CAUSES OF ACTION

### COUNT I
### (42 U.S.C. § 1983)
### (Against All Individually Named Defendants In Their Individual Capacities)

87.     Plaintiffs incorporate the facts alleged above.

88.     The acts of the individual Defendants constituted conduct under color of federal and state law which deprived Decedent of the rights, privileges, and immunities secured by the Constitution and the laws of the United States.

89.     As a direct and proximate result of the individual Defendants' acts and omissions, the individual Defendants deprived Decedent of clearly established rights under the Eighth and

16

Fourteenth Amendments to the United States Constitution, more specifically the right to be free from the use of excessive and unreasonable force and seizure; the right to be free from the deprivation of life and liberty without due process of law; and the right to be free from cruel and unusual punishment.

90.     As a direct and proximate result of the individual Defendants' violations of Decedent's constitutional rights ultimately culminating in his savage death, Plaintiffs suffered damages, including pecuniary loss, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, attention, advice, and guidance. Ms. Hall, as personal representative of the Estate, has incurred funeral expenses and non-economic damages, including Decedent's conscious pain and mental anguish just prior to this death.

**WHEREFORE,** Plaintiffs respectfully request this Honorable Court grant the following relief:

A.     Enter a judgment in favor of Plaintiffs and against the individual Defendants in their individual capacities, jointly and severally, for compensatory damages in excess of $75,000;

B.     Enter a judgment in favor of Plaintiffs and against the individual Defendants in their individual capacities, jointly and severally, for punitive damages in excess of $75,000;

C.     Assess reasonable attorneys' fees and costs of suit in favor of Plaintiffs and against the individual Defendants in their individual capacities, jointly and severally; and

D.     Grant Plaintiffs such other and further relief as the nature of their cause may warrant.

## COUNT II
**(Violation of Maryland Declaration of Rights Articles 24 and 26)**
**(Against all Defendants)**

91.     Plaintiffs incorporate the facts alleged in paragraphs 1 through 86.

17

92.    Defendants' acts and omissions constituted violations of rights guaranteed to Decedent under Article 24 and 26 of the Maryland Declaration of Rights.

93.    As a direct and proximate result of Defendants' acts and omissions, Defendants deprived Decedent of clearly established rights under the Maryland Declaration of Rights, Articles 24 and 26.

94.    As a direct and proximate result of Defendants' violations of Decedent's rights created by Articles 24 and 26 of the Maryland Declaration of Rights, Plaintiffs suffered damages, including pecuniary loss, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, attention, advice, and guidance. Ms. Hall, as personal representative of the Estate, has incurred funeral expenses and non-economic damages, including Decedent's conscious pain and mental anguish prior to this death.

**WHEREFORE,** Plaintiffs respectfully request this Honorable Court grant the following relief:

A.    Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, for compensatory damages in excess of $75,000; and

B.    Grant Plaintiffs such other and further relief as the nature of their cause may warrant.

18

## COUNT III
### (Md. Code Ann., C.J. § 3-901 *et seq.* - Wrongful Death)
### (Against all Defendants)

95.     Plaintiffs incorporate the facts alleged in paragraphs 1 through 86.

96.     Defendants had a duty to act reasonably towards Decedent and provide adequate security measures in light of the circumstances then and there existing.  Despite this duty and in direct disregard thereof, Defendants wrongfully caused the death of Decedent.

97.     As a direct and proximate result of Defendants' negligence and/or gross negligence, Plaintiffs suffered damages, including pecuniary loss, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, attention, advice, and guidance.  Ms. Hall, as personal representative of the Estate, has incurred funeral expenses and non-economic damages, including Decedent's conscious pain and mental anguish prior to this death.

**WHEREFORE**, Plaintiffs respectfully request this Honorable Court grant the following relief:

A.      Enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, for compensatory damages in excess of $75,000; and

B.      Grant Plaintiffs such other and further relief as the nature of their cause may warrant.

## COUNT IV

### (Survival Action)
### (Against all Defendants)

98.     Plaintiffs incorporate the facts alleged in paragraphs 1 through 86.

99.    Defendants' acts and omissions caused Decedent's death and amounted to
violations of rights secured by the U.S. Constitution and the Maryland Declaration of Right. Those
same acts and omissions constituted negligence and/or gross negligence on the part of Defendants.

100.    As a direct and proximate result of Defendants' acts and omissions, Ms. Hall, as
personal representative of the Estate, claims damages for pain and suffering, deprivation of rights,
humiliation, emotional distress, fear, fright, and mental anguish and for funeral expenses.

**WHEREFORE**, Plaintiffs respectfully request this Honorable Court grant the following
relief:

A.    Enter a judgment in favor of Plaintiffs and against Defendants, jointly and
severally, for compensatory damages in excess of $75,000; and

B.    Grant Plaintiffs such other and further relief as the nature of their cause may
warrant.

/s/
ROBIN R. COCKEY, ESQUIRE
CPF # 8011010072
ASHLEY A. BOSCHÉ, ESQUIRE
CPF # 0712110076
Cockey, Brennan & Maloney, P.C.
313 Lemmon Hill Lane
Salisbury, MD 21801
410-546-1750
Fax: 410-546-1811
rrcesq@cbmlawfirm.com
bosche@cbmlawfirm.com
*Attorneys for Plaintiffs*

INSURANCE DIVISION
19 SEP 17 PM 1:59

20